IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

MICHAEL NUNEZ,

Defendant.

**8:16CR27**

**MEMORANDUM AND ORDER**

This matter is before the Court on the defendant's motion and briefs in support of compassionate release for sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), Filing Nos. 81, 91, 92 and 95. The Court appointed the Public Defender's office to represent defendant and requested that the United States Probation Office review the plan of home detention. Filing No. 82. Defendant requests that this Court reduce his sentence to time served or allow him to serve the remainder of his sentence on home confinement. The probation office has filed the investigation report indicating that the suggested home confinement is acceptable, if the Court chooses to grant the motion for compassionate release. Filing No. 97 at 4.

The Court notes that during the pendency of this action, Mr. Nunez contracted COVID-19.

Mr. Nunez was sentenced on September 1, 2016, to a term of 120 months custody for Conspiracy to Distribute 50 Grams or More of a Mixture of Methamphetamine. He was also sentenced to a five-year term of supervised release. The defendant has a criminal history category of IV. There was two-level enhancement pursuant to USSG §

1

2D1.1(b)(1), as several factors connected the defendant to possession of a firearm during drug trafficking.  Mr. Nunez has prior convictions involving weapons, including: Firearm-Possession Under 21 and Carry Concealed Weapon.  He has prior convictions for drug possession, including: Marijuana Possession, Possession of a Controlled Substance, and Delivery and Distribution of a Controlled Substance.  Mr. Nunez also has a criminal history including Theft-Receiving Stolen Property, Assault and Battery, False Information, Attempted Theft, and Willful Reckless Driving.  He has been a user of methamphetamine and marijuana in the past, and according to the Bureau of Prison inmate records, Mr. Nunez participates in drug education programming.  He is projected to release from the Bureau of Prisons on August 25, 2024.

## DISCUSSION

The First Step Act amended numerous provisions of the U.S. Code to promote rehabilitation of prisoners and unwind decades of mass incarceration.  Cong. Research Serv., R45558, The First Step Act of 2018: An Overview 1 (2019).  Congress designed the provision at issue here, 18 U.S.C. § 3582(c)(1)(A), for "Increasing the Use and Transparency of Compassionate Release."  § 603(b), 132 Stat. at 5239.  Section 3582(c)(1)(A) allows defendants, for the first time, to petition district courts directly for compassionate release.  *Id.*  Compassionate release provides a path for defendants with "extraordinary and compelling reasons" to leave prison early.  § 3582(c)(1)(A)(i).  Such a sentence reduction must comply with the 18 U.S.C. § 3553(a) factors and "applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A).

Pursuant to § 3582(c)(1)(A), a defendant may (after exhausting his or her administrative remedies) move for reduction of his or her term of imprisonment based

upon "extraordinary and compelling reasons."  The Court, after considering the factors enumerated in 18 U.S.C. § 3553(a)[1], may grant the motion if extraordinary and compelling reasons warrant the reduction, and such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.[2]  Accordingly, an initial review of the defendant's claim will involve these inquiries:

    1.    Has the defendant exhausted administrative remedies?

    2.    Has the defendant identified extraordinary and compelling reasons for reducing his or her term of imprisonment?

    3.    Would application of the § 3553(a) factors permit reducing the defendant's sentence if those extraordinary and compelling reasons were substantiated?

    4.    Ensure that any reduction is consistent with applicable policy statements.

18 U.S.C. § 3582(c)(1)(A).

Already "tinderboxes for infectious disease," prisons now are even more dangerous than we typically accept.  *United States v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020).  The Attorney General has

---

[1] The statute states: (1) in any case--

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--

(i) extraordinary and compelling reasons warrant such a reduction; . . .

***** and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A).

directed the BOP to consider increased use of home confinement for at-risk inmates. Memorandum from U.S. Att'y Gen. William Barr to Dir. of Bureau of Prisons (Mar. 26, 2020).

### A.  Exhaustion

The Court finds that the defendant has met the exhaustion requirement.  *See United States v. Brown*, 2020 WL 2091802, at *5 (S.D. Ia. Apr. 29, 2020) ("Defendant satisfied the exhaustion requirement's text and purpose [when] [h]e gave the BOP the first chance to review his circumstances and let thirty days pass before proceeding to court.").  Defendant filed such a motion with the BOP and 30 days have elapsed.  *See* Filing No. 82-1.

### B. Medical Vulnerability

Next, the Court finds that defendant's physical and medical vulnerability to COVID-19 are not necessarily an extraordinary or a compelling reason for a change in defendant's sentence.[2]  *See* e.g., U.S.S.G. § 1B1.13 comment. n.1(A)-(C).  As Judge Gerrard recently observed in Jenkins, there is currently "no 'applicable' policy statement cabining the Court's discretion to act under § 3582(c)(1)(A)."  *United States v. Jenkins*, 2020 WL 2814437, at *3 (D. Neb. May 26, 2020); *see also United States v. Redd*, 2020 WL 1248493, at *5 ( E.D. Va. March 16, 2020) ("there does not currently exist, for the purposes of satisfying the First Step Act's 'consistency' requirement, an 'applicable policy statement.'"); *United States v. Brown*, 411 F. Supp. 3d 446, 449 (S.D. Iowa 2019) (canvassing cases and holding that courts, rather than the outdated policy statements, should determine whether a defendant qualifies for compassionate release); *United*

---

[2] *See* defendant's medical records at Filing No. 84.

*States v. Beck*, 425 F. Supp.2d 573, 579 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i).").

COVID-19 is clearly a global pandemic that presents extraordinary and compelling release for certain prisoners. It is unprecedented. COVID-19 appears to pose a particular risk for individuals with certain existing health conditions. These include a compromised immune system, obesity, heart disease, hypertension, chronic lung disease, diabetes mellitus, and asthma. Groups at Higher Risk for Severe Illness, Ctrs. for Disease Control & Prevention (April 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

Mr. Nunez has a tremor and causes his hand and head to shake. The CDC advises that those with neurological disorders may be at higher risk of severe illness from COVID-19. CDC, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. Nunez has been seen several times while in prison by the medical staff for his tremors. Genetic testing has not apparently been conducted, but Mr. Nunez says his daughters have a genetic disorder of a rare disease known as LCHAD, and thus he thinks he is a carrier of LCHAD, which he believes puts him at risk for contracting COVID-19. Mr. Nunez argues that over the past few months, a significant percentage of individuals requiring hospitalization due to COVID-19 have had underlying neurological conditions. *See United States v. Powell*, 468 F.Supp.3d 398 (D.C. 2020).

For the week ending October 10, 2020, 24.2% of individuals hospitalized with COVID-19 had some kind of neurologic disease.[3] https://gis.cdc.gov/grasp/COVIDNet/COVID19_5.html (last accessed October 16, 2020).  He likewise contends he has DiGeorge syndrome, also a genetic disorder.  This has not been confirmed.

The Medical Center for Prisoners in Springfield, Missouri has had a number of confirmed positive cases for COVID-19, and on October 22, 2020, the number had risen from 6 to 60 inmates and 13 staff members in one week who were positive.  Within the next week, the Bureau of Prisons reported 143 inmates have tested positive at MCFP Springfield.

Mr. Nunez was also a chronic smoker for over 20 years.  The CDC has stated that "[b]eing a current or former cigarette smoker may increase your risk of severe illness from COVID-19."  CDC, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#smoking.

The government contends that this chronic tremor has been stable since 2006.  There is no specific trauma/illness associated at this point in time with the tremors.  Further, there is nothing in his medical records, argues the government regarding DiGeorge syndrome.   The medical records show that the jail medical staff refused to do

---

[3] "The director of Johns Hopkins' Neurocritical Care Precision Medicine Center of Excellence, Robert Stevens, M.D., has been tracking patient cases at Johns Hopkins. He observes:
[P]atients with COVID-19 can have a variety of neurological presentations, including confusion, loss of consciousness, seizures and stroke. Additional manifestations that have been reported are loss of smell and taste, headaches, trouble focusing and changes in behavior. Patients are also having peripheral nerve issues, such as Guillain-Barré syndrome, which can lead to paralysis and respiratory failure. I estimate that at least half of the patients I'm seeing in the COVID units have neurological symptoms.
https://clinicalconnection.hopkinsmedicine.org/news/neurological-conditions-and-covid-19."  Filing No. 91 at 4-5.

a genetic test to show with certainty if Mr. Nunez has this disorder, even though his daughters have it.

The Court does not believe the medical evidence establishes that Nunez is at significantly higher risk for Covid-19 complications.  Further, at this point in time, he already had COVID-19.  The Court has seen no evidence that he suffered clear complications from COVID-19.  The evidence as to his current health conditions is not strong enough for the Court to find that he is at increased risk at this time.  Further, the Court has seen no evidence that Nunez is likely to contract COVID-19 again.

### C.  Section 3553(a) Factors

Finally, the Court must consider if compassionate release comports with any applicable § 3553(a) factors.  *See also* § 3582(c)(1)(A).  When reviewing the § 3553(a) relevant factors, the balance of those factors supports a sentence of home confinement. The Court has already established that Nunez's health conditions do not place him at heightened risk for severe illness from COVID-19.  At most, contends the government, Mr. Nunez is an unaffected carrier of LCHAD, and there exists no risk to him.

Defendant is 37 years old.  As stated in the investigative report, "According to BOP records, Mr. Nunez has completed several education courses including GED coursework, Wellness and Health courses, Legal Research and Law Library courses, Career Employment, and USP Narcotics Anonymous. Mr. Nunez is currently participating in Drug Education coursework. His disciplinary record in the BOP includes one incident of being insolent to a staff member and one incident of allowing another inmate to use his phone. Included in his packet for consideration of release were letters from his superiors at work in the BOP. These letters affirmed Mr. Nunez is a hard worker,

consistent and reliable." Filing No. 97 at 2.[4]

   Likewise, Nunez seems to have an acceptable place of home confinement. Initially, the probation officer investigated the home of Diane Nunez, sister to Mr. Nunez. She agreed to allow her brother to reside with her and her son.   However, after several attempts at a virtual tour at her home failed, the officer was advised that they were requesting defendant's placement be at his Aunt and Uncle's residence, Michelle and Gary Smith. The Smiths indicate they are willing and able to assist their nephew where they have a three bedroom house, and Mr. Nunez can stay in the basement.   No drugs or firearms or weapons are in their home.   A criminal record check was also completed on Michelle and Gary Smith.  Michelle had one conviction for a misdemeanor for Dog At Large in 2010.   Gary Smith had one misdemeanor conviction for Driving Under the Influence in 2001.   The probation officer conducted a virtual tour of the proposed residence and found no evidence of contraband.

   The government argues that defendant's criminal history includes arrests and convictions for assault and battery, possession of controlled substances, theft and carrying a concealed weapon.  The underlying conviction included possession of methamphetamine, over $7,000 in cash, a ballistic vest, and a Walther P22 firearm. He fled from the U.S. Marshals at a high rate of speed and crashed his cars, where the officers found a .45 caliber firearm.  However, Nunez contends that he was not the driver of the car and was in fact pulled from the passenger seat.  That appears to be accurate.

---

[4] The government argues that defendant might present a danger to the community.  Under 18 U.S.C. § 3142(g), the Court must consider four factors in determining whether the defendant might present a danger for release or detention of a defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g)(1) – (4).

The Court will deny the motion for compassionate release. First, since the filing of the motion and the briefing by the parties, defendant contracted COVID-19. Second, although it is clear that neurological factors can play a part in the symptoms associated with COVID-19, there is no evidence that this disease creates an increased risk for the defendant, particularly given that he has already had COVID-19. Third, past evidence confirms that Nunez had a propensity for violence that could be harmful to the public. Although it is clear the defendant has improved while in prison, and the Court commends him on his steps to improve, the Court is unwilling to find that Nunez no longer is a threat to society. The Court believes that prison incarceration is necessary "to protect the public from further crimes of the defendant." § 3553(a)(2)(C). The past conduct is indicative of risk to harm to others if he is released. Based on these findings, the Court finds that the § 3553(a) factors militate towards denying defendant's compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i).

For the reasons stated herein, defendant's Motion for compassionate release, Filing No. 81, is denied.

Dated this 9th day of December, 2020.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge

9